F. Byron Todd v. Commissioner.
Todd v. Commissioner
Docket No. 14471.
United States Tax Court
1948 Tax Ct. Memo LEXIS 75; 7 T.C.M. (CCH) 715; T.C.M. (RIA) 48203; October 1, 1948
Millard L. Midonick, Esq., and Martin Wolman, Esq., 415 Lexington Ave., New York, N. Y., for the petitioner. J. Frost Walker, Jr., Esq., for the respondent. MURDOCK Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies and additions to the tax for negligence with respect to the income and victory tax of the petitioner for the calendar years 1943, 1944 and 1945 in the following amounts: 5 per cent
Year
Deficiency
Addition
1943
$21,587.36
$1,433.75
1944
10,602.34
530.12
1945
18,534.20
926.71 1942 is also involved because of the effect upon 1943. The errors assigned are that the Commissioner erred (1) in taxing the entire net income of Todd and Company, an alleged partnership, *76 to the petitioner rather than to the petitioner, his wife and trusts for their two minor children in accordance with their partnership and trust agreements; (2) in disallowing certain deductions claimed by Todd and Company under section 23 (a) (1) and (2) of the Internal Revenue Code; and (3) in imposing a 5 per cent addition to the tax for negligence under section 293 (a) of the Internal Revenue Code. Findings of Fact The petitioner filed his individual tax returns for the years in question with the collector of internal revenue for the district of Alabama. He lived in Attalla, Alabama and has been engaged in various metal products businesses there. The petitioner and his wife, Nena, entered into an agreement dated June 30, 1941, in which they expressed an intention to form a co-partnership "for the purpose of carrying on the business of industrial engineers". The partnership was to continue for five years unless earlier terminated. It was to have the name of "Todd and Company". The petitioner was to contribute $4,500 and Nena was to contribute $1,250. Profits and losses were to be shared equally "after the payment of reasonable salaries *77 to each of the partners". The petitioner was to "exercise the duties of Superintendent of said firm and shall devote so much of his time as may be requisite in advising, overseeing and directing the said business." It was provided in the agreement that either or both "may donate his or her income or capital stock to his or her child or children". The arrangement was terminated on December 31, 1946. Nena had no separate estate of her own in June 1941 except an interest in a limited partnership then shown on its books at $11.54, and one share of stock in Compress Buckle Company, a Texas corporation, hereafter referred to as Buckle (Texas). She had no engineering or other business experience and was not required by the agreement to devote any of her time to the affairs of Todd and Company. The record does not show that either the petitioner or Nena contributed any cash pursuant to their agreement and it does not appear that Todd and Company had any assets other than two contracts mentioned herein until late 1941 when it acquired 138 shares of Buckle (Texas) stock. A limited partnership (successor to a corporation) in which the petitioner and his brother, L. B. Todd, were general partners *78 and his mother, the firm's accountant and Nena were special partners, owned 147 shares of the stock of Buckle (Texas) during the summer of 1941. A certificate for 145 of those shares was not issued in the name of the limited partnership until October 1941. The capital accounts of the partners were shown as follows for June 30, 1941 on the books of the partnership: Petitioner
$3,424.53
L. B. Todd
1,470.08
Petitioner's Mother
1,340.77
Nena
11.54
Account
7.13 The stock of Buckle (Texas) at that time was held as follows: Limited Partnership
147 shares
Petitioner
4 shares
L. B. Todd
5 shares
Petitioner's Mother
71 shares
Nena
1 share
Outsiders
72 shares
Nena acquired her interest in the limited partnership and in Buckle (Texas) from the petitioner, but the record does not show that she ever paid him anything for those interests. Buckle (Texas) organized a corporation of the same name under the laws of Alabama on June 24, 1941. That corporation will hereafter be referred to as Buckle (Alabama). Buckle (Texas) thereupon transferred all of its assets to Buckle (Alabama) in exchange for the entire 300 shares of common stock of Buckle (Alabama). *79 The petitioner was president of both corporations. Buckle (Texas), through H. L. Pruett, who had a promotion contract allowing him 50 per cent of its profits, had been negotiating with the War Department for contracts to manufacture shells. A representative of the War Department addressed a letter dated June 24, 1941 to Compress Buckle Company, Attalla, Alabama, enclosing a contract which was in part as follows: "The United States of America acting through the undersigned Contracting Officer, and in accordance with negotiations previously had with you hereby places with you an order for 4,000,000 shell, * * * at * * * a total contract price of $920,000. Deliveries on this order shall begin on or about September, 1941, and shall be completed on or before May, 1942. * * * "If this order is acceptable to you, will you kindly so indicate hereon and on the two copies of this order, and return this order and the two copies thereof on or before June 30, 1941. Upon receipt of such acceptance and the approval of this order by the Under Secretary of War it will constitute a contract. It is contemplated that this contract will be supplemented by a more formal contract between yourself and *80 the United States of America substantially following United States Standard Contract Form No. 32. A performance bond in the amount of 20% of the total contract price will be required at the time the supplemental contract is executed." * * * The petitioner accepted the contract as president of Buckle (Alabama) on June 24, 1941. The contract had previously been approved by the Under Secretary of War. Buckle (Alabama) purchased machinery for manufacturing shells but did not have sufficient funds to pay for it, to supply the performance bond or to carry out the contract. The War Department threatened to cancel the order. The petitioner anticipated a profit of about $200,000 if the order could be carried out and he endeavored to make some arrangement whereby the anticipated benefits would not be lost. He eventually met William A. Falls as an indirect result of a discussion which he had with D. D. Snyder. The petitioner and Falls met early in July 1941 and discussed the situation with respect to the contract. They decided that Falls would purchase all of the stock of Buckle (Alabama) from Buckle (Texas), would get releases from all of the stockholders of Buckle (Texas) and would get *81 a release from Pruett. Falls agreed with the petitioner that he would pay Buckle (Texas) $35,000 for the stock and the releases and would pay the petitioner 5 per cent of the contract price on the existing munitions contract, plus 1 per cent of the contract price on all future government orders which might be obtained by the companies in which he was interested. A memorandum of their agreement was made at that time but was not offered in evidence. They agreed to enter into a formal contract at a later date. Buckle (Texas) and Falls entered into an agreement dated July 10, 1941 providing for the sale of the Buckle (Alabama) stock to Falls for $35,000, for the purchase by Buckle (Texas) of the buckle manufacturing machinery owned by Buckle (Alabama), for the assumption by Falls of liabilities of Buckle (Alabama) not to exceed $14,000 and for the procurement by Buckle (Texas) of a release from Pruett. The petitioner obtained a release from most of the Buckle (Texas) stockholders and a release from Pruett, which he presented to Falls on July 11, 1941. The release from the Buckle (Texas) stockholders provided, inter alia, that the stockholders "expressly consent to the employment of *82 F. B. Todd by Compress Buckle Company, Inc., of Alabama, and to the payment to the said F. B. Todd of such compensation or salary as may be agreed upon between the said F. B. Todd" and Buckle (Alabama), and they also waived any claims against Todd on account of such employment "or on account of any personal advantages, preferences or benefits that may accrue to the said F. B. Todd from said sale of said 300 shares of common stock by Compress Buckle Company, a Texas corporation, to W. A. Falls, whether arising out of such employment or otherwise." Buckle (Texas) used $5,000 of the $35,000 received from Falls to obtain the release from Pruett, paid stockholders outside of the Todd group $100 per share for their stock and releases and used the balance to purchase the buckle manufacturing machinery from Buckle (Alabama) and to pay notes which Buckle (Alabama) had given for the purchase of machinery to manufacture shells. The stock obtained from the outside stockholders was held as treasury stock by Buckle (Texas). Buckle (Texas) did not pay anything to the Todd group for their releases. The petitioner personally promised his mother that he would pay her $450 plus at least $300 per *83 month for at least two years for her Buckle (Texas) stock if she would sign the release and he promised his brother that he would pay him some undisclosed amount from the money which he expected to receive from Falls for his Buckle (Texas) stock if he would sign the release. They signed and later the mother's Buckle (Texas) stock was transferred to the name of Todd and Company as was the treasury stock obtained from outsiders. The record does not show what became of L. B. Todd's Buckle (Texas) stock. The name of Buckle (Alabama) was changed to Attalla Manufacturing Company on July 28, 1941. Falls, as president of Attalla Manufacturing Company, party of the first part, and the petitioner, signing himself as "sole owner" of Todd and Company, party of the second part, entered into an agreement on August 20, 1941, entitled "Employment Contract Between Attalla Manufacturing Company and F. B. Todd, Doing Business As Todd & Company". It provided in part as follows: "The party of the first part hereby employs the party of the second part, and the party of the second part agrees to render services to the party of the first part upon the following terms and conditions: "(1) The party *84 of the first part is now engaged or is about to engage in the manufacture of munitions and may from time to time manufacture other munition products of various kinds, and the said party of the first part employs the party of the second part to promote the sale of any such products manufactured by said party of the first part, and to give the party of the first part technical and engineering advice and help such as first party requires and as is necessary in the promotion of the sale of any of such products for such length of time as the party of the second part renders such services and first party continues to manufacture munitions for the United States Government." It further provided that Attalla should pay for the services rendered 5 per cent of the amount of the existing contract for the manufacture of shells and 1 per cent of the amount of any other orders filled by Attalla. Paragraph 4 of the agreement was as follows: "The party of the second part agrees to make such trips as may be requested of him by the party of the first part for the purpose of promoting its interests from time to time and it is understood and agreed that any such trips made by the party of the second *85 part for the purpose of promoting sales of the products of the party of the first part shall be made at the sole expense of the party of the second part, and that any trips made by the party of the second part for purposes other than his regular duties shall be made at the expense of the party of the first part." Another similar agreement entitled "Employment Contract Between Falls Spring & Wire Company and F. B. Todd, Doing Business As Todd & Company" was entered into on September 2, 1941 and signed by Falls for Falls Spring & Wire Company and by petitioner as "sole owner" of Todd and Company. It contained provisions similar to those in the contract of August 20, 1941 except that the only compensation mentioned was 1 per cent of any orders or contracts for the sale of munitions filled by Falls Spring & Wire Company. That contract recited that Falls Spring & Wire Company was the owner of the capital stock of Chelsea Spring Company and was the sole sales representative of Great Lakes Spring Corporation and that the contract covered orders for munitions secured by them. Both of the foregoing contracts contained a provision that any compensation due the party of the second part under *86 the contracts should be paid to his estate in the case of his death. Revised contracts which were given the dates of the two original contracts were later signed by the same parties and substituted for the originals at times not disclosed by the record. These contracts were substantially the same as the originals except that they eliminated the provision about the payment to the estate of Todd in the case of his death, eliminated references to "sales promotion" by him, and were signed by Todd as a partner of Todd and Company instead of as sole owner. The contract with Falls Spring & Wire Company was modified on September 1, 1942, to provide that compensation should be changed to $2,000 per month. It was signed by F. B. Todd as a partner of Todd and Company. The companies in which Falls was interested converted from the manufacture of automobile parts to the manufacture of munitions in 1941 because production in the automobile industry had been halted by the war. Falls and his companies had not had any experience in the manufacture of munitions prior to 1941. The petitioner did not hold any degree in engineering and had had no previous experience in the production of munitions. *87 The petitioner was employed by Falls under the contracts mentioned above for the purpose of obtaining government orders and to expedite production and the placing of bids. The petitioner obtained information with reference to production of munitions from other plants for the benefit of the Falls plants. Falls relied upon the petitioner's contacts with government ordnance personnel to assist in securing orders for the manufacture of munitions. The petitioner traveled extensively for these purposes during the taxable years. He did not devote all of his time to these matters but he was subject to call at any time. Nena did not perform any services under the contracts with the Falls companies. Todd and Company received the following amounts under the Attalla Manufacturing Company and Falls Spring & Wire Company contracts during its fiscal years ending June 30: 1942, $29,125.18; 1943, $49,146.66; 1944, $30,357.96; 1945, $30,453.60. 5 per cent of the original contract taken over by Attalla was $46,000. Todd and Company invested some of the funds which it received under the Falls contracts in a newsstand, in some properties which it rented and in interests in other companies. The only *88 rent which it received during the taxable years was $595.53 during 1943 and $424 during 1944. The only income which it had during the years here involved from the newsstand was $698.20 for 1943 and $932.19 for 1944. It sold the newsstand in 1944 for a net gain of $603.46. The remainder of its income for those years was principally from investments in other companies and from other activities not explained in this record. The record does not show the total expenses incident to the earning of the income from the various sources mentioned above or that any one of the activities resulted in a net profit to Todd and Company. The petitioner devoted two or three hours a week to the newsstand and the rental properties. Nena performed some services for the newsstand and rental properties. She was paid a salary of $1800 for 1942 and $2400 for the later years by Todd and Company. She performed no vital services for Todd and Company during any of the taxable years. The income of Todd and Company during the taxable years was attributed primarily to the personal services rendered by the petitioner. Capital was not a material factor in the production of the income of Todd and Company during those *89 years. The petitioner and his wife, in June 1942, created two trusts, one for each of their minor children. They transferred without consideration a one-fourth interest in Todd and Company to each of the trusts. They appointed their attorney trustee and gave him broad powers of administration. The income of the trusts was to be payable to the beneficiaries during their minority and they were to receive the corpus when they became of age. The terms of the trusts had not expired during the taxable years. Neither child and neither trust performed any services for Todd and Company. The net worth of Todd and Company at the time of the transfer was about $10,200. Nena and the trusts for their minor children were not bona fide partners of Todd and Company for income tax purposes during the taxable years. The Commissioner included all of the net income of Todd and Company in the income of the petitioner in determining the deficiency. Todd and Company paid to the petitioner's mother $2,508.75 during 1942, $3,701 during 1943, $1,300 during 1944 and $1,100 during 1945. Those amounts were included in deductions claimed for those years as salaries. The mother rendered no services to Todd *90 and Company during those years and the amounts were not salaries. They were paid as consideration for release by the mother of Buckle (Texas) stock and as consideration for the sale by her to Todd and Company of shares of Buckle (Texas) stock. Todd and Company paid to L. B. Todd $638 during 1942 and $687.41 during 1943. Those amounts were included in deductions claimed for those years as salaries. L. B. Todd rendered no services to Todd and Company during those years and the amounts were not salaries. Todd and Company was the owner of an automobile which was used by the petitioner partially in connection with the business of Todd and Company and was also used by the petitioner and his wife for pleasure. A reasonable allowance for depreciation on the car is $150 for each of the first three years and $120 for 1945. The ordinary and necessary expenses of operating the automobile during each of those years in the business of the petitioner $200were for the first two, $100 for 1944 and $20 for 1945. The petitioner and/or Todd and Company made a number of payments during 1942, 1943 and the first few months of 1944 to hotels and airlines. A few similar payments were also made to railroads *91 and the Pullman Company. An undisclosed part of the expenditures described in this paragraph was made by or for the petitioner in connection with the business carried on by him. The record does not contain sufficient information in regard to the expenditures to enable the Court to determine the extent to which they were ordinary and necessary expenses of the business carried on by the petitioner. Todd and Company paid $46.40 during 1942 to advertise the newsstand operated by it and $200 during 1944 for the same purpose. Each of those expenditures was an ordinary and necessary expense of the business carried on by Todd and Company during that year. The petitioner had conferred in 1941 with S. Roth on the question of whether Roth might provide the capital necessary to perform the munitions contract for a share of the profits. Roth threatened to sue the petitioner after he entered into the contract with Falls, claiming that the contract with Falls was in violation of an agreement between the petitioner and Roth. The petitioner, in order to settle that controversy, agreed to pay Roth $800 and, at some time not disclosed by the record, the petitioner gave Roth notes for $800. The record *92 does not show when the notes were given, whose notes they were or when, if ever, they were paid. D. D. Snyder was reimbursed in some way not shown and at times not shown by the record, for $123.36 of expenses which he incurred in bringing Falls and another man to Attalla. The petitioner gave Christmas gifts to the bookkeeper of Todd and Company, to employees of the Falls company and to employees of the Birmingham Ordnance Department during 1942 and 1943. The petitioner employed H. L. Rudge of Fort Worth, Texas, to assist him in obtaining information from the American Manufacturing Company of that place to be used in making a bid for a contract for manufacturing shells. The petitioner paid Rudge $500 for the services thus rendered at some time not disclosed by the record. C. H. Forest was employed by Falls Spring & Wire Company in Detroit as auditor and comptroller. The petitioner at some time not shown by the record paid Forest $100 in order to expedite payments to Todd and Company of amounts due it under the contract with Falls Spring & Wire Company. The petitioner at some time not disclosed by the record paid $65 for some "freeon" to be used in an air conditioner in his *93 Todd and Company office. The record does not show whether the article was used in connection with the original installation of the machine or whether it was used to replace other material. A part of the deficiency for each year was due to negligence or intentional disregard of rules and regulations. Opinion MURDOCK, Judge: The evidence in this case is confusing, inadequte, inaccurate, sometimes contradictory, and generally unsatisfactory. This situation is aggravated by the failure of the petitioner to put in evidence either the notice of deficiency or a copy of the revenue agent's report to which it apparently refers and upon which it apparently is partially based. The petitioner comes here in order to have this Court hold that the Commissioner erred. Obviously, it is extremely difficult for the Court to say that the Commissioner erred until it is reasonably certain of what he did. The Court, thus inexcusably burdened, has struggled to make findings of fact, but as is proper in such situations, the petitioner must suffer the consequences of shortcomings in his proof. Cohan v. Commissioner, 39 Fed. (2d) 540. The main contention of the petitioner, in his unsigned *94 briefs, is that he, his wife, and two trusts created by them were equal partners in Todd and Company, and the Commissioner erred in taxing all of the income of the business to the petitioner instead of recognizing for tax purposes that it was distributable to the four partners. The principal income of Todd and Company during those years consisted of amounts received from the various Falls companies. The petitioner concedes that the other activities of Todd and Company were "relatively unprofitable". He contends that the contracts which he entered into with Falls were not entered into by him solely on his own behalf but rather on behalf of the alleged partnership, the partnership received income under those contracts during the taxable years merely by "holding income bearing property", that is, the contracts, and the income was in no sense compensation for personal services of the petitioner as an individual. The Commissioner, on the other hand, has disregarded the alleged partnership for income tax purposes and has taxed all of the income from the business operated under the name of Todd and Company to the petitioner. The fact that Nena had no qualifications to carry on the business *95 of "industrial engineers" and evidence that the petitioner entered into the Falls contracts on his own behalf may be passed without further comment because it appears that the income from the Falls contracts is taxable to the petitioner in any event. Those contracts in the hands of Todd and Company were not "income bearing property" like stocks or bonds. They were not capital which, unaided, produced income. The petitioner contends that the amounts received under those contracts were not for his personal services. Not only does the evidence fail to support that contention, but it shows affirmatively that the payments received under those contracts were for his personal services, including his assistance in the procurement of munitions contracts, in the making of bids and in the performance under those contracts. The findings of fact show that his services and compensation therefor were repeatedly mentioned not only in the contracts themselves but also in the releases which the petitioner obtained from the Buckle (Texas) stockholders. Those facts are consistent with those alleged in paragraph 5 (i) of the petition. Apparently the petitioner changed his mind about this phase of the case *96 before coming to trial but, on cross examination, he admitted that he was required to perform, and had performed, important service for the Falls companies under the contracts. Falls testified that the payments were intended to be, and actually were, for services performed by the petitioner for the Falls companies. The evidence justifies the finding that the payments were for services of the petitioner. The cases of Commissioner v. Tower, 327 U.S. 280, Lusthaus v. Commissioner, 327 U.S. 293, and numerous others are authority for not recognizing Nena and the trusts for income tax purposes, and for affirming the action of the Commissioner in attributing all of the income here in question to the petitioner who earned it. Cf. Lucas v. Earl, 281 U.S. 111. The case in regard to the trusts is weak for additional reasons. The trusts were never mentioned in any partnership agreement. They contributed nothing to the business except the interests which purportedly had been given to them concurrently by the petitioner and Nena. It was held in the cases cited above that such contributions are not sufficient to constitute one a partner for income tax purposes *97 where that one contributes no services whatsoever. There are some further points in connection with the contention that Nena was a partner which, perhaps, should be discussed briefly. The petitioner and Nena actually entered into a partnership agreement. The petitioner contends that Nena thereby acquired, with him, a one-half interest in the Falls contracts from which the income in question flowed without any services on his part. Parts of this contention have been discussed above. The petitioner argues that Nena made an important contribution of property to Todd and Company and also she performed vital services in the earning of the income of Todd and Company. Although it does not appear that any contribution of property to Todd and Company was responsible for the earning of its income, nevertheless it should be pointed out here that no substantial contribution by Nena to Todd and Company is shown by the evidence. She had no property of any substantial value to contribute. She had an interest in the limited partnership which was valued at $11.54 at the time the partnership agreement was entered into. One share of Buckle (Texas) stock stood in her name at that time. The record indicates *98 that its value was not more than $100, at the most. Neither of those organizations was dissolved and Nena retained her interests therein. The petitioner contends, however, that Nena acquired and transferred to Todd and Company the interest of the petitioner's mother in the limited partnership, which he described as "stock". The petitioner testified that Nena had some kind of an arrangement with his mother that she would pay an undisclosed amount to the mother for the mother's interest in the limited partnership, which amount Nena was to pay from her share of the profits of Todd and Company. However, the evidence does not show when any such plan was entered into, what its terms were, or that it was ever carried out, and it does not appear that any of the income here in question was derived as the result of any such contribution to Todd and Company by Nena. Nena performed some minor services in connection with a newsstand and some rental properties for Todd and Company, but she was paid adequate salary for those services, which salary was apparently allowed as a deduction. The petitioner makes a feeble argument that she contributed vital services to the partnership, but it is apparent *99 that she did not and that the petitioner was supreme and virtually alone in the management of the affairs of the business. The Commissioner did not err in taxing all of the income of Todd and Company to the petitioner. The next issue is whether the petitioner has demonstrated the right to deductions described in the petition as salaries to his mother for each year and salaries to his brother, L. B. Todd, for two years, depreciation and expenses of operating a car during each of the years, travel expenses for each year, including train and airplane fares, hotel rooms and meals, advertising expenses in the amount of $46.40 for 1942 and $200 for 1944, commissions in the amount of $923.36 for 1942, sales promotion and entertainment of customers for 1942 and 1945, gifts to employees for 1942 and 1943, legal and investigating expenses in the amount of $2,725 for 1943, and office repairs in the amount of $65 for 1944. Reference to years of Todd and Company means the fiscal year ending in the year mentioned. The deficiencies in the evidence mentioned above make the decision of this issue unreasonably difficult for the Court which must consider numerous loose ends to see if anything can be *100 made of them and, no doubt, unsatisfactory to the petitioner who must lose in case the Court can not come to any comfortable conclusion on a particular point. The petitioner has failed to give adequate assistance on this issue in his briefs. The first point is the deductibility of amounts paid to the petitioner's mother and brother, L. B. Todd, as "salary." It seems safe to conclude from the briefs that deductions for those items were claimed on the returns and disallowed in the determinations of the Commissioner. Neither payee ever performed any services for Todd and Company and it is clear that no amount paid to either would be deductible by the payor under any theory. The evidence shows that the payments to the mother were either gifts by a son to support his mother or purchase price for the acquisition by Todd and Company of the mother's 71 shares of Buckle (Texas) stock, a capital expenditure rather than a deductible expense. There is some evidence that the payments to L. B. Todd were purchase price for his Buckle (Texas) stock. Neither the mother nor the brother was a partner, joint venturer, or participant in the activities of Todd and Company or entitled as a principal or *101 earner to any of the income of Todd and Company. The petitioner has claimed deductions for depreciation and for expenses of operating an automobile. The Commissioner concedes in his brief that those deductions were disallowed because the automobile was operated entirely for pleasure and was not used in the business of Todd and Company. The petitioner testified that the automobile was used about equally for pleasure and for business, but his general statements about the business purposes of expenditures are partial and unreliable. His testimony indicates also that some of the travel on trips which he considered business trips was for pleasure rather than for business. Nevertheless some deductions are proper and approximations have been made under the principle of Cohan v. Commissioner, supra. The next item may be described as travel expense. It includes train and airplane fares and amounts paid hotels apparently for room and board. An exhibit shows in some detail the amounts paid to airplane companies and hotels during 1942 and 1943 and the first few months of 1944. It also shows a few similar payments to railroads and the Pullman Company. This same exhibit indicates *102 that a part of these expenditures were allowed as deductions. For example, the indication is that $600 or more was allowed for 1942 and $900 was allowed for 1943. The petitioner did not testify as to what each expenditure was for. He merely stated in general that they were for travel. It might be assumed that the payments to airplane companies and railroads were for travel of some kind and that a part, at least, of the payments to hotels was for board and lodging, but the amounts are large and need more explanation than is given in this record in order to justify any increase in the deductions already allowed. For example, there are payments to Netherland Plaza, presumably a hotel, of $49.53 on October 9-11, $70 on October 10, $192.25 on October 12, and other payments to that same hotel during the latter part of September. Obviously those payments were not made solely for ordinary and necessary board and lodging of the petitioner. Similar doubts arise as to other of the alleged travel expenditures and no change in these items is justified by this record. The evidence in regard to the alleged advertising expenses is rather sketchy but findings have been made that they were ordinary *103 and necessary expenses of the business. Another assignment under this issue is that the Commissioner erred in disallowing commissions of $923.36 for 1942. The petitioner testified that this related to $800 represented by a note which he gave to S. Roth, and $123.36 which he paid in some way to D. D. Snyder. The record does not show that the Commissioner disallowed these deductions or, if he disallowed them, his reason for disallowing them. It does not show how the books were kept or how the returns were filed. It does not show when, if ever, the note was paid, or whose note it was. The giving of a note for $800 to Roth without payment of the note would not represent a deductible item on a cash basis. Obviously, the Tax Court is in no position to order any change in the Commissioner's determination in regard to this item. The petitioner testified that the balance of $123.36 was to reimburse D. D. Snyder for the expenses he incurred in bringing Falls and another man to Attalla. It might be assumed that this was Falls' first trip to Attalla on which he met the petitioner and entered into the original agreement with him. If that is a proper assumption then it might have been a capital *104 expenditure of some kind made before the Falls contracts were entered into and before Todd and Company had any business. But whatever it was, suffice to say, that the present record does not justify a holding that the Commissioner erred in some respect in his treatment of it. The next item is described in the petition as sales promotion and entertainment of $929.41 for 1942 and $247.45 for 1945. The record is so unsatisfactory and inadequate in regard to these items that it does not justify even a finding of fact in regard to them. There is no evidence to show the individual expenditures going to make up the totals or the purpose for which any particular expenditure was made. The record does not show what the Commissioner did about these items in determining the deficiencies. The situation in regard to gifts is much the same. The petitioner said he gave Christmas presents to the Todd and Company bookkeeper, to a number of Falls employees and to several persons employed at an ordnance depot. The propriety of the latter might be seriously questioned. Neither the amount nor the business purpose of any of these claimed deductions has been shown. Here again the record is devoid of any *105 information as to the action of the Commissioner and does not justify a finding that any error was involved therein. The next item under this deduction issue is described in the petition as legal and investigating expenses in the amount of $2,725 for 1943. Evidence was introduced in regard to only $600 of this item. The petitioner testified that he employed H. L. Rudge of Fort Worth, Texas, to assist him in obtaining information from the American Manufacturing Company of that place, to be used in making a bid for a contract for manufacturing shells. He had seen a contract or bid of that company at the Ordnance Depot. Here again the record does not show the action of the Commissioner in regard to this item. The circumstances and nature of this transaction are not sufficiently shown by the record to justify a finding that this expenditure was an ordinary and necessary expense. It may have involved improper prying into the affairs of others which would hardly be an ordinary and necessary expense of a business. The petitioner also testified that he paid $100 to the auditor and comptroller of Falls Spring & Wire Company, whose duty it was to make out checks for the amount due Todd and *106 Company under its contract with Falls Spring & Wire Company, so that he would expedite the payments. The propriety of this payment might be seriously questioned, but regardless of that, it does not appear from this record that it was an ordinary and necessary business expense of Todd and Company to pay an employee of another company to issue checks which Todd and Company was entitled to receive. The next and last item under this issue $65is which the petitioner claimed for 1944 as office repairs. He said it was for "freeon" for an air conditioner in his office. The record does not show the action of the Commissioner in regard to this item or whether the article was used in the original installation of the machine or to replace other material. The petitioner could easily have cleared that doubt from the record but he did not do so and no change in the Commissioner's action in regard to this item is justified. The attitude of the Court in regard to a few of the items discussed under this second issue may appear to be narrow and technical, but the petitioner has made that attitude justifiable, if not necessary, through his own fault in reporting income in the first place, in inadequate *107 pleadings and in confusing and unsatisfactory evidence. The final issue is whether the petitioner has shown that the Commissioner erred in adding to the tax under 293(a) because a part of the deficiency for each year was due to negligence or intentional disregard of rules and regulations. Not only has the petitioner failed to prove his case on this issue but the evidence shows affirmatively that a part of the deficiency for each year is due to negligence. There are for each of the taxable years a number of substantial deductions apparently claimed on the returns and disallowed by the Commissioner on which the petitioner has offered no evidence. These include commissions of $1,470 for 1942 and legal and investigating expenses of $2,125 for 1943. The same might be said of a large part of the travel expenses claimed for 1944. The petitioner's failure to substantiate other items was so gross that it tends to prove negligence. The petitioner concedes that there was deducted as salaries of Todd and Company $235 for 1942, $275 for 1943, $571.18 for 1944, and $550 for 1945, representing amounts paid to W. G. Todd, a wholly paralyzed and indigent brother of the petitioner, who never worked *108 for Todd and Company and who had absolutely no claim on that business for any salary or pension. The petitioner testified that his brother had worked for other businesses in which he had been interested in the past and when his brother's resources ran out these amounts had to be paid to help the brother until he died during the last year. A deduction of $72.85 was taken in the last year, representing flowers purchased for the funeral of this brother. The petitioner had consulted a certified public accountant in regard to the deduction of the so-called salary paid this brother, as well as in regard to that paid to his mother and another brother, L. B. Todd. The accountant had told him that salaries are not deductible unless they represent compensation for services actually rendered to the business of the payor. The petitioner makes the feeble suggestion that the services had been rendered to predecessor businesses but the record clearly shows that Todd and Company had no predecessor business. There were other family businesses but Todd and Company was in no sense a successor, except in point of time, to any of those businesses. This discussion will not be prolonged by mentioning other *109 deductions negligently taken on the returns. Decision will be entered under Rule 50.